AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

FILED
CLERK, U.S. DISTRICT COURT

12/1/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

12/1/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

| United States of America | |
|---|---|
| v. | Case No.   2:23-mj-06153-DUTY |
| JASON CHIN, | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 27, 2023, in the county of Los Angeles in the Central District of California, the

defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC 953, 963 | Attempted Exportation of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Virginia Mariscal*
*Complainant's signature*

Virginia Mariscal, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   December 1, 2023

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Stephanie S. Christensen
*Printed name and title*

AUSA: Colin Scott, x3159

**AFFIDAVIT**

I, Virginia Mariscal, being duly sworn, declare and state as follows:

I.        **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint against and arrest warrant against JASON CHIN ("CHIN") for Attempting to Export a Controlled Substance, namely cocaine, in violation of 21 U.S.C. §§ 953, 963.

2.   This affidavit is also made in support of an application a for warrant to search the person of CHIN, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations 21 U.S.C. 953, 963 (attempted to export a controlled substance) (the "Subject Offense"), as described more fully in Attachment B.   Attachments A, and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

5.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance

and in part only, all amounts or sums are approximate, and all
dates and times are on or about those indicated.

## II. **BACKGROUND OF SPECIAL AGENT VIRGINIA MARISCAL**

6.   I am a Special Agent with the United States Department
of Homeland Security ("DHS"), Immigration and Customs
Enforcement, Homeland Security Investigations ("HSI") where I
have worked since September of 2020.  I am currently assigned to
the HSI Los Angeles El Camino Real Financial Crimes Task Force,
Group 3 ("ECR3").  During my tenure as a criminal investigator,
I have completed approximately 350 hours of instruction at the
Federal Law Enforcement Training Center in Glynco, Georgia
("FLETC") and completed the Criminal Investigator Training
Program ("CITP").  Following CITP, I completed Homeland Security
Investigations Special Agent Training ("HSISAT").  HSISAT
consisted approximately 350 hours of training in handling HSI
specific investigative cases that include but are not limited to
Worksite Enforcement, Human Trafficking, Drug Smuggling, and
Money Laundering.  HSI is responsible for enforcing federal
criminal statutes prohibiting, among other things, the
distribution of and possession with intent to distribute drugs,
in violation of Title 21 of the United States Code.
Additionally, HSI investigates the smuggling of illicit cargo
and items into and out of the United States.

7.   Prior to my tenure as a criminal investigator, I
worked as a Parking Enforcement Officer with the Downey Police
Department in California for 2 years.  I obtained a Bachelor of

Arts in Criminal Justice at the California State University of
Fullerton.

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

8.   Since September of 2023, ECR3 and the Pasadena Police
Department ("PPD") have been conducting a joint investigation of
Jason CHIN. CHIN, a New Zealand national, has been negotiating
with a HSI confidential informant ("CI") to purchase hundreds of
kilograms of cocaine. CHIN believes the cocaine will be
transported to Australia where it will be distributed by members
of CHIN's drug trafficking organization.

9.   As described below, CHIN's recorded communications
make clear that he is an experienced drug trafficker with ties
to organized crime in Hong Kong and New Zealand.

10.   In November of this year, CHIN agreed to purchase 20
kilograms of cocaine from the CI at a price of $21,000 per
kilogram.   On November 26, 2023, CHIN flew into the United
States, to conduct the transaction.   On November 27, 2023, the
CI and CHIN met in person to conduct the transaction.   At that
time, CHIN paid the CI cryptocurrency worth approximately
$160,000 in United States Dollar Tether(USDT)[1]for the cocaine
which be believed would be transported to Australia.

---

[1] USDT is a cryptocurrency stablecoin. A stablecoin is a
type of cryptocurrency where the value of the digital asset is
pegged to a reference asset, in this case the United States
dollar.

11.  Based on a review of flight information, CHIN is scheduled to fly out of Los Angeles to Hong Kong on December 2, 2023 at 11:10 a.m.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

13.  In early September of 2023, a DEA confidential informant ("CI-2")[2] was contacted by a broker located in Cancun, Mexico (the "Broker").  The Broker contacted CI-2 regarding a potential narcotics buyer.  The Broker, who is unaware of CI-2's cooperation with law enforcement, told CI-2 that the buyer was interested in purchasing narcotics in the United States and having them shipped to Australia.  Federal agents later learned that the interested buyer was CHIN.

### A.   Initial Contact by CI-2 and CI with CHIN

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following.

---

[2] CI-2 initially began working for DEA in 2022 and was later signed up as a CI with Pasadena PD in 2023. In or around March of 2022, the CI-2 was arrested for conspiracy to distribute cocaine. The CI-2 is currently providing information to investigators for a lesser sentence in their pending investigation.  CI-2 has previously provided information to Pasadena PD in other investigations that have been corroborated and proven to be reliable, and has not provided any information that was later determined to be false or otherwise unreliable.

15.  CI-2 told law enforcement that over Labor Day weekend in 2023, they were contacted by a drug broker based out of Cancun, Mexico about a potential drug buyer later identified as CHIN.  This initial contact was not recorded.

16.  The Broker told CI-2 that CHIN was interested in purchasing narcotics, specifically cocaine, in the United States and would pay to have the narcotics exported to Australia.  The Broker explained to CI-2 that the Broker and CHIN[3] were currently in Los Angeles over Labor Day Weekend and wanted to meet with a supplier.  CI-2 informed the Broker that he would connect the Broker with a potential supplier in Southern California.  CI-2 then passed the Broker's information on to law enforcement.  Law enforcement then instructed the CI[4] to make contact with the Broker.

17. On September 3, 2023, the CI called the Broker, in a recorded conversation, and arranged to meet at a Starbucks in the City of Industry that day.  Law enforcement then observed the CI, CHIN, and the Broker meet at the prearranged location. This meeting was audio recorded.

---

[3] I have reviewed travel records for CHIN which show that CHIN flew into Los Angeles on August 31, 2023 from New Zealand and returned to New Zealand on September 5, 2023 from Los Angeles.

[4] CI began working for HSI in 2015.  In or around March of 2011, the CI was arrested for burglary and was later charged with a misdemeanor for trespassing. The CI is currently providing information to investigators for monetary compensation and immigration benefits.  The CI has provided truthful information to investigators which has been independently corroborated.  The CI has previously provided information to the DEA in another investigation that has been corroborated and proven to be reliable.

18.  During the meeting, CHIN and the Broker discussed selling "product" in Australia.  CHIN told the CI and Broker that "if we just take it off you, our margin is really low. So when we give to our boys running on the street, we make only $25,000. You know, the margin is quite low. Because we have a wholesale price, standard wholesale price, and then we go to market. Maybe a little bit. But the price you give us would be the wholesale price for us, but we are willing to here buy the product."

19.  During that meeting, CHIN told the CI and Broker that "we can do that every month. We got like Melbourne today, two crews, solid crews, for 20 years. But we have to give like if I'm a pusher, I used to be a pusher. I still do that. But if I push, you better give me a good product because I'm going to use my fucking, my heart, my soul, everything, you know, I mean, so they have to give me good price."

20.  At the end of this conversation CHIN and the CI agreed to communicate further about a deal.

**B.   CHIN Communicates Further with CI-2 and CI**

21.  On September 7, 2023, CHIN called CI-2 and asked if he could purchase drugs directly from him.[5]  During the call, CHIN told CI-2 that he would want approximately 300-400 kilograms of cocaine exported to Australia per month.  CI-2 stated that they would reach out to the CI to see if they could supply that amount.

---

[5] This phone call was not recorded.

22.  On September 27, 2023, CHIN messaged the CI, in a recorded text message, that he wanted the CI to mail a sample of approximately 1-2 grams of cocaine via postal mail to Australia. CHIN instructed the CI to mail the sample wrapped in aluminum foil and to place the sample in a music birthday card addressed to the following consignee: "Ms. Jenny Chan" at Heretaunga, Upper Hutt 5018, New Zealand.

23.  The CI told CHIN that they were not comfortable sending a sample and that they would Facetime CHIN and show him samples of the product instead.

24.  Utilizing law enforcement databases, I determined that the previous address belongs to CHIN and CHIN's family.

**C.   CI Video Calls CHIN on October 17, 2023 to Show Him a Sample of the Product**

25.  Based on my review of recordings and speaking to other law enforcement officers, I know that on October 17, 2023, the CI initiated a Facetime call[6] with CHIN at the direction of law enforcement.  An undercover officer from Pasadena PD ("UC") was also present during the call.

26.  In the Facetime call, which was video recorded, the CI and UC showed CHIN approximately twenty kilograms of cocaine.[7] The UC and CI opened a kilogram of cocaine to show CHIN the quality of the drugs.  After expressing his approval about the

---

[6] Unless otherwise noted, all video and audio calls between the CI, CI-2 and CHIN have been recorded and preserved. The WhatsApp messages between the CI, CI-2, and CHIN have also been preserved.

[7] The narcotics utilized for the Facetime were obtained by Pasadena PD through a reverse stock pursuant to an ex-parte state court order.

product, CHIN stated that he needed the product shipped to either Sydney or Melbourne, Australia.  CHIN stated that the product needed to be cleared through customs and he would have individuals waiting for the load at the port.

27. During the call, CHIN agreed that the narcotics would be shipped to Australia via cargo ship.  The CI and UC spoke with CHIN and agreed upon CHIN paying approximately $6,500 per kilogram shipped and that CHIN would split the profit that he would make through the sales of the product in Australia with the CI.

28. During the call, CHIN stated that he needed to confirm with his "brothers" in Australia before moving forward with the deal.  CHIN also stated that he would pay for the drugs in cryptocurrency.

29. CHIN stated that he would like to purchase approximately 50 kilograms of cocaine initially.  The CI stated that they would not transport small quantities and would only transport if the quantity was 100 kilograms.

30. CHIN confirmed the amount was acceptable and asked if the CI was confident with the transporters they were going to utilize to ship the narcotics to Australia.  The CI confirmed that the transporters could be trusted, and CHIN confirmed that they had a deal.

### C. CI and HSI UC conduct a phone call with CHIN on November 1, 2023

31. Based on my review of recordings and speaking to other law enforcement officers, on November 1, 2023, the CI conducted

a recorded phone call with CHIN to further discuss the details
of the deal and payment for the narcotics.  Under the direction
of HSI ECR3 agents and Pasadena PD Detectives, the CI conducted
the recorded call.  The CI was accompanied by a HSI UC.  The HSI
UC was there to serve as the CI's cryptocurrency advisor and to
assist in translating the conversation for the CI.[8]

32.  During the call, CHIN asked the HSI UC if they were
briefed on the deal and the product being used, along with what
countries CHIN would like to distribute in.  Specifically, CHIN
said "I want to get straight to the jump, we are talking about
product not just crypto."

33.  CHIN stated that he would not pay for the narcotics
that day since he was waiting for product to land in Syndey,
Australia during the week.  CHIN asked the CI to confirm the
pricing of shipping the narcotics to Australia.  CHIN also said
he wanted to ship product from the United States to Hong Kong,
China.

34.  The CI confirmed that they would have the narcotics
ready to be transported the following week.  CHIN stated that
either he or an associate would come to Los Angeles to "check
the product before it would be shipped" to Australia.  CHIN
confirmed that once the narcotics were shipped, he had "guys" in
Hong Kong or Sydney that could receive the product.

35.  CHIN again told the CI that he was waiting for a
shipment of product to come into Syndey in approximately a week.
CHIN said that once he received money from distributing the

---

[8] The vast majority of this transcript is in English.

product from the deal, meaning illegal narcotics, he would be able to conduct the deal with the CI.

36. CHIN expressed concern about the certainty of the narcotics making it to Syndey once the deal with the CI was complete. CHIN stated that he "couldn't have his partners invest in something that isn't going to go through." The CI told CHIN that they were going to make sure the product was delivered. CHIN then said, "You just need to tell me how much the backdoor costs, the shipping shit."

37. CHIN stated that the transporters that the CI would be utilizing would have to get the narcotics through customs, CHIN's "guys" could only receive the shipment. CHIN said that he would like narcotics shipped to Hong Kong if possible and that he had interest from "two bosses" already for the narcotics. The CI stated that they would look into it for CHIN.  The following is an excerpt from the discussion:

CHIN: "He understand that he's going to do all that."

UC: "He's going to be handling all that."

CHIN: "Beautiful. Beautiful. Yeah. The other thing is, because I'm going back to Hong Kong today, so if he can talk to his guys, if he's got product in Hong Kong, we can take it straight away. We'll pay whatever he wants, because I need a proof of life, right, because once we get the product. Then we move a few bricks, then we can do the investment."

CI: "No problem"

CHIN: "I've got like a lot of guys in Hong Kong, so I got 2 bosses that like wanna work with us already. . . If anyone has product in Hong Kong and can give us a couple bricks, we'll take it. I don't give a fuck what price."

38. During this discussion, CHIN said that he did not want a large amount of narcotics exported to Australia initially. CHIN only wanted "five or six bricks" sent to start.

39. CHIN told the CI that "my time is expensive, I'm doing things in China. I've been to LA a few times already and tested product and it doesn't lead anywhere. I just need guys who can get the product there and we will distribute it."

40. During the call, the CI and CHIN haggled over the price of the product and who would bear the financial risk of the shipment. CHIN stated, "you can't expect us to pay for $30,000 upfront that covers everything" and that "I understand where he is coming from, I am negotiating these things with people in Malaysia, around the world."

41. The CI told CHIN that they would like to consult with CI-2 to confirm the terms of the deal with CHIN. CHIN stated that he would go with whatever CI-2 agreed to since he trusted CI-2.

42. CHIN asked if the product could be shipped via air since it would be faster than freight. The CI stated that they would discuss doing so with CI-2.

D.  **The CI conducts additional phone call on November 14, 2023 with CHIN**

43.  Based on my review of recordings and speaking to other law enforcement officers, on November 14, 2023, the CI conducted a recorded call with CHIN to confirm the amount of narcotics to be shipped to Australia.  CHIN stated that he only wanted to purchase 20 kilograms of cocaine initially and that he would come to Los Angles to look at the product before it was shipped to Australia.

E.  **CHIN flies to Los Angeles to Sample Drugs on November 26, 2023**

44.  Based on my review of recordings and speaking to other law enforcement officers, I know that on November 26, 2023, CHIN flew into Los Angeles from Hong Kong and was picked up by CI-2 at LAX.  Law enforcement then followed the CI-2 and CHIN to CHIN's hotel, The London located at 1020 N San Vicente Blvd., West Hollywood, CA 90069.

45.  At the hotel, CI-2 and CHIN discussed the deal with the CI.  This discussion was audio recorded.  CI-2 stated that the CI would meet with CI-2 and CHIN the following day. CI-2 stated that the price would be $13,000 per kilogram and CHIN would have to pay an additional $3,000 for the pilot who would be transporting the product.

46.  CI-2 told CHIN that the CI is reliable and would get the narcotics to Australia. CHIN stated that he trusts CI-2 is "loyal" to him.

47.  CHIN then stated that the people he uses in Sydney to pick up the product fly in from Aukland, New Zealand to "do the

job". CHIN stated that all his workers are from out of town.
CHIN stated that once the deal goes through, he would like to
try to ship narcotics to Hong Kong because the narcotics would
sell for more and CHIN would make a larger profit than selling
in Australia. CHIN said that he would like to use the CI for
future weekly shipments of narcotics if the deal went through.

48. CHIN stated that he would initially purchase 20
kilograms and would ask the CI to bring the product the
following day so that CHIN could see it. The following is an
excerpt from the discussion:

> CHIN: "So first of all, I think tomorrow. We should say
> asking him how many he have right now on hand to make sure
> what he has. Do you understand it?"
>
> CI-2: "And I think so."
>
> CHIN: "Second, he's saying a OK, let's start."
>
> CI-2: "I think so."
>
> CHIN: "I feel, I feel good with 20. So no more than that."

49. CHIN then stated that he had a new narcotic that he
would like to ship into the United States.  CHIN stated that he
received the narcotic from a lab in China and would eventually
want to make a lab in the United States to distribute the
narcotic.

### F.   THE CI and CI-2 meet on November 27, 2023 with CHIN to Sell the Cocaine

50. Based on my review of recordings and speaking to other
law enforcement officers, I know that on November 27, 2023, the
CI and CI-2, met with CHIN at The London Hotel in West

Hollywood. Law enforcement conducted surveillance of the meeting and closely monitored the CI-2 and Pasadena PD UC via audio recording devices worn by the CI-2 and Pasadena PD UC.

51. Law enforcement observed the CI-2 go inside the hotel to meet with CHIN at the hotel bar. The CI and UC went inside shortly after to meet with CHIN and CI-2. During that meeting, the CI confirmed with CHIN that a pilot would take the narcotics that evening and fly from Los Angeles to Sydney, Australia.

52. CHIN then stated that he would have people meet with the pilot at the hotel they were staying at in Sydney to retrieve the product. CHIN then asked to go see the cocaine.

53. Law enforcement then observed, CHIN, the CI and the UC walk outside the hotel to the CI's vehicle, a silver Honda Civic bearing temporary California license plate of BG32N89. The CI and UC showed CHIN two kilograms of actual cocaine. CHIN then asked the CI to cut into a kilogram of the cocaine so that he could see the product.

54. CHIN then took pictures of the product to send to his "brother". CHIN stated "oh wow, look at that" after the CI opened the kilogram. CHIN then took a sample of the cocaine from the kilogram to test the product. CHIN then agreed to go forward with the deal and asked the CI how many kilograms they had in their vehicle. The CI stated that they had approximately ten kilograms and CHIN stated he only had enough to purchase the ten kilograms.

55. The CI, Pasadena UC, and CHIN then exited the CI's vehicle and went back inside the hotel to complete the deal.

CHIN then transferred a $10 USDT test payment from his cryptocurrency wallet, CR4hCT9bd, to the UC cryptocurrency wallet, 6bFeDazH9k. Once the test payment was confirmed, CHIN then transferred $150,000 USDT to the UC cryptocurrency wallet to finalize the payment.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[9]

56. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[9] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

57.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises or in a short period of time for a number of reasons, including the following:

    a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

58.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHIN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CHIN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

59. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

60. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the

seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

61. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. CONCLUSION

62. For all the reasons described above, there is probable cause to believe that CHIN has committed violations of 21 U.S.C. §§ 953, 963 (Attempting to Export a Controlled Substance). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person of CHIN as described more fully in Attachment A.

/s/
_____

Virginia Mariscal, Special
Agent
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __1st__ day
of December, 2023.

_____
HONORABLE STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE